[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from the decision of the defendant, Branford inland wetlands commission (the commission), approving an application of the defendant, Stop Shop Supermarket Co. (Stop Shop), to conduct certain regulated activities. The plaintiff, The Great Atlantic Pacific Tea Co., Inc./Waldbaum's Food Market, Inc. (AP), brings this appeal pursuant to General Statutes § 22a-19. CT Page 585
 BACKGROUND
On May 5, 2000, Stop Shop applied to the commission for a permit to begin a proposed earth excavation operation at 1151, 1201, and 1219 West Main Street, Branford, Connecticut.[1] (Return of Record [ROR], Exhibit 2.) The commission held a public hearing commencing on July 13, 2000 and continued to August 10 and September 14, 2000. (ROR, Exhibits 19, 21, 23.) On August 10, 2000, AP filed an intervention petition pursuant to General Statutes § 22a-19. On October 12, 2000, the commission approved Stop Shop's application for excavation, concluding that Stop Shop's proposal would benefit the wetlands at issue and would not unreasonably impact the surrounding environment. (ROR, Exhibit 25.)
On October 19, 2000, Stop Shop received notice of the commission's decision along with the permit to conduct the requested regulated activities. (ROR, Exhibit 17.) Notice of the decision was subsequently published in the Branford Review. (ROR, Exhibit 44.) AP timely filed this appeal alleging that the commission acted arbitrarily, illegally and in abuse of its discretion in approving Stop Shop's application. On March 29, 2001, AP filed a supporting brief On April 27, 2001, Stop Shop filed a brief in opposition, to which the commission concurred. On May, 11, 2001, the commissioner of environmental protection also filed a brief
 DISCUSSION
Before addressing the substantive components of this appeal the court must address the threshold issue of aggrievement. "[P]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiffs appeal." Jolly, Inc. v. Zoning Boardof Appeals, 237 Conn. 184, 192, 676 A.2d 831 (1996). AP asserts standing as an intervenor pursuant to General Statutes § 22a-19. "Section 22a-19
(a) allows any person, partnership, corporation, association, organization or any other legal entity to intervene as a party in any administrative . . . or other proceeding, and in any judicial review thereof that involves conduct which has, or is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." (Internal quotation marks omitted.) Red Hill Coalition, Inc. v.Conservation Commission, 212 Conn. 710, 715, 563 A.2d 1339 (1989). "An intervening party under § 22a-19 (a), however, may raise only environmental issues." Id.
An individual who files a notice of intervention at the underlying agency hearing, pursuant to § 22a-19 (a), has standing to appeal from CT Page 586 the commission's decision for that limited purpose. Id., 715; BranhavenPlaza, L.L.C. v. Inland Wetlands Commission, 251 Conn. 269, 276 n. 9,740 A.2d 847 (1999). In the present case, AP filed a notice of intervention at the public hearing held by the commission on July 20, 2000. AP alleges that the commission acted arbitrarily and in abuse of its discretion in the following ways: (1) failing to adhere to its own regulations; (2) failing to follow statutory authority; (3) rendering a decision unsupported by the record; (4) approving an application that failed to conform to the commission's regulations; and (5) neglecting to make findings required by law. This court finds that AP is statutorily aggrieved, pursuant to § 22a-19 (a), and has standing to bring this appeal.
The next issue is whether AP timely served the defendants. General Statutes § 22a-43 (a) provides in relevant part that an appeal from a decision by the inland wetlands commission must be commenced "within the time specified in subsection (b) of section 8-8 from the publication of such . . . decision or action. . . . Notice of such appeal shall be served upon the inland wetlands agency and the commissioner." Additionally, "[t]he commissioner may appear as a party to any action brought by any other person within thirty days from the date such appeal is returned to the court." (Internal quotation marks omitted.) General Statutes § 22a-43 (a). General Statutes § 8-8 (b) provides in relevant part that an "appeal shall be commenced by service of process in accordance with subsections (e) and (f) [now subsections (f) and (g)] of this section within fifteen days from the date that notice of the decision was published as required by the general statutes." General Statutes § 8-8 (b).
The record contains an affidavit of publication attesting that notice of the commission s decision was published in the Branford Review on October 25, 2000. (ROR, Exhibit 44.) On November 9, 2000, the appeal was commenced by service of process on the town clerk of Branford, the clerk of the Branford inland and wetlands commission, the attorney general, Stop Shop and the department of environmental protection. Therefore, this appeal was commenced in a timely manner by service of process on the proper parties.
As previously stated, AP appeals on the basis that the commission acted arbitrarily, capriciously and in abuse of its discretion in granting Stop Shop's application. AP sets forth several arguments: (1) the commission neglected to assess the application under the factors delineated in General Statutes § 22a-41 (b); (2) the commission did not explicitly state on the record its consideration of § 22a-41; (3) the commission failed to properly consider reasonable alternatives pursuant to § 22a-41 (a)(2) and § 22a-41 (b)(1); (4) the CT Page 587 commission did not consider the impact of storm water discharge onto the wetlands in question; and (5) the commission failed to adhere to its own regulations in granting Stop Shop's application.
 A. Whether The Commission Failed To Consider The Criteria Set Forth In General Statutes § 22a-41 (a)
The first issue is whether the commission must explicitly state on the record its assessment of the criteria enumerated in § 22a-41 (a). AP argues that if the commission states its reason on the record, but fails to explicitly refer to the factors listed under § 22a-41 (a), then the reviewing court must reverse the agency's decision. Stop Shop counters that Connecticut law does not require an agency to make an express finding on the record. This court finds that the absence of an explicit reference to § 22a-41 is not a basis for sustaining this appeal.
This conclusion comports with the deference courts traditionally give to municipal agencies when reviewing administrative decisions. The statutory scheme governing inland wetlands delegates broad discretion to the municipalities. General Statutes § 22a-42 directs "municipalities to establish a commission and promulgate regulations governing wetlands and watercourses in their respective communities." Branhaven Plaza,L.L.C. v. Inland Wetlands Commission, supra, 251 Conn. 279-80. "Courts must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for technical infirmities in their actions. . . . This cautionary advice is especially apt whenever the court is reviewing a decision of a local commission composed of laypersons." (Citations omitted, internal quotation marks omitted.) Samperi v. Inland Wetlands Agency, 226 Conn. 579, 596,628 A.2d 1286 (1993).
Our Supreme Court has not construed the wetlands act to require reversal of an agency's decision because the agency failed to state the basis for its decision on the record. The court has explained that "it is improper for the reviewing court to reverse an agency decision simply because an agency failed to state its reason for its decision on the record. The reviewing court instead must search the record of the hearings before that commission to determine if there is an adequate basis for its decision." (Internal quotation marks omitted.) Id., 588-89. When considering an application to conduct regulated activities, "[t]he agency does not have to specify the considerations it used in evaluating the application based on the six factors in section 22a-4
1 (a), and it is sufficient if the entire record allows reasonable CT Page 588 inferences that the agency adhered to the factors in the statute." R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (1999) § 33.9, p. 183.
This same logic applies to situations where the agency has proffered an inadequate reason. In these instances, the reviewing court acts legitimately within its province when it searches the record in its entirety for an appropriate basis to affirm the agency's decision.Stankiewicz v. Zoning Board of Appeals, 15 Conn. App. 729, 732,546 A.2d 919 (1988), aff'd Stankiewicz v. Zoning Board of Appeals,211 Conn. 76, 78, 556 A.2d 1024 (1989). In Stankiewicz, several abutting landowners appealed from a decision by the zoning authority granting variances. The court concluded that the trial court did not err in reviewing the record and upholding the agency's decision. Id., 733.
Central to the court's analysis was the fact that a zoning board consists of laypersons whose responsibility is to protect the interest of property owners against unlawful zoning regulations governing the variance process. Id., 732. Consequently, the reviewing court "may rely on any reason culled from the record which demonstrates a real or reasonable relationship with the general welfare of the community in concluding that the board's decision should be upheld." Id., 733. "Although it is desirable for a zoning authority to state the grounds for granting a variance and the failure to do so renders the court's review more cumbersome, it does not preclude the court from upholding the board's decision. If the board fails to give the reasons for its actions, or if its reasons are inadequate, the trial court must search the record to determine whether a basis exists for the action taken." Id.
The court subsequently applied Stankiewicz within the context of the wetlands act. In Gagnon v. Inland Wetlands and Watercourses Commission,213 Conn. 604, 569 A.2d 1094 (1990), the court was asked to determine the trial court's scope of review when the agency does not provide an adequate basis on the record for its decision. Gagnon v. Inland Wetlandsand Watercourses Commission, 213 Conn. 604, 605, 569 A.2d 1094 (1990). The court rejected the landowners' argument that Stankiewicz is inapplicable to the wetlands act. Id., 610. The court viewed planning and zoning cases as analogous because the language obligating inland wetlands agencies to state their reasons on the record is akin to the text governing other land use agencies. Id., 611. The court also reiterated the fact that land use agencies are comprised of laypersons who may not be able to comply with the procedural mandates governing their proceedings. Id.
In the present matter, the commission referred to and considered the following factors before rendering its final decision: (1) whether the CT Page 589 public trust was unreasonably polluted, impaired or destroyed by the proposal; (2) whether the impact is acceptable; and (3) whether there are any reasonable or prudent alternatives. (ROR, Exhibit 25.) After evaluating these factors, the commission approved the application subject to several conditions. (ROR, Exhibit 25.) AP contends that the commission articulated a reason on the record, albeit one cloaked in the language of § 22a-19 rather than § 22a-41 (a), and therefore, the court's review is limited solely to that portion of the record. AP argues that the commission proffered an inadequate reason for approving the application. Therefore this court may review the record in its entirety for substantial evidence supporting the decision despite the commission's apparent focus on § 22a-19.
The next issue for this court to consider is whether the record contains substantial evidence to support a finding that the commission considered the criteria enumerated in § 22a-41 (a). "In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial. . . ." (Internal quotation marks omitted.) Samperi v. InlandWetlands, supra, 226 Conn. 587-88. "[I]t is improper for the reviewing court to reverse an agency decision simply because an agency failed to state its reason for its decision on the record. The reviewing court instead must search the record of the hearings before that commission to determine if there is an adequate basis for its decision." (Internal quotation marks omitted.) Id., 588-89; Gagnon v. Inland Wetlands Watercourses Commission, supra, 213 Conn. 611.
It is well established that "when challenging an administrative agency action, the plaintiff has the burden of proof . . . The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . ." (Internal quotation marks omitted.) Newton v. Keeney, 234 Conn. 312, 319, 661 A.2d 589 (1995);Samperi v. Inland Wetlands Agency, supra, 226 Conn. 587. "The reviewing court may grant relief from the agency's decision only where the decision is arbitrary, illegal or not reasonably supported by the evidence." (Internal quotation marks omitted.) Keiser v. Conservation Commission,41 Conn. App. 39, 41, 674 A.2d 439 (1996).
In the present case, AP contends that the commission focused improperly on the factors delineated in § 22a-19 and, therefore, the court is limited to the portion of the record containing the commission's CT Page 590 evaluation of those factors. Stop Shop responds that the record reveals that the commission considered the factors set out in § 22a-41 (a) and that it was not required to submit such findings in writing. This court finds that a review of the entire record evinces substantial evidence demonstrating that the commission evaluated the criteria set out in § 22a-41 (a).
General Statutes § 22a-42a (d)(1) requires that a commission "[before] granting, denying or limiting any permit for a regulated activity the inland wetlands agency, or its agent, shall consider the factors set forth in section 22a-4 1, and such agency, or its agent, shall state upon the record the reason for its decision." General Statutes § 22a-42a (d)(1). The factors delineated in § 22a-41
address a variety of environmental issues including: the impact of the regulated activity on the wetlands, feasible alternatives, the damage sustained by the property as a result of the regulated activity, and the impact on wetlands outside of the area where the activity is proposed.[2]
When reviewing the agency's decision under the substantial evidence standard, the reviewing court must "defer to the agency's assessment of the credibility of the witnesses . . . even an expert, in whole or in part." (Internal quotation marks omitted.) Gardiner v. ConservationCommission, 222 Conn. 98, 108, 608 A.2d 672 (1992). "[A]n administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." (Internal quotation marks omitted.) Samperi v. Inland Wetlands Agency, supra, 226 Conn. 597. Moreover, "[k]nowledge obtained through personal observations of the locus may be properly considered by the agency in arriving at reasons for its denial." (Internal quotation marks omitted.)Kaeser v. Conservation Commission, 20 Conn. App. 309, 316, 567 A.2d 383
(1989).
The commission approved Stop Shop's application based upon the extensive evidence before it. Throughout the public hearings, the commission heard testimony from a plethora of speakers, both for and against the application, including, but not limited to: attorneys, engineers discussing the excavation plan and proposed mitigation measures, and interested parties discussing the impact of the proposal on the surrounding environment. (ROR, Exhibits 19, 21, 23.) The commission also reviewed the application; (ROR, Exhibit 2); and the site engineering reports. (ROR Exhibits 3-4.) Based upon this evidence, the commission made several findings. The commission concluded that the proposed excavation would not detrimentally impact the wetlands or surrounding environment and there were no reasonable alternatives. (ROR, Exhibit 25.) CT Page 591
AP's argument that the commission did not assess the criteria listed in § 22a-41 is not supported by the record.[3] The record is replete with discussion on the factors enumerated in § 22a-41.[4]
The environmental impact on the wetlands and watercourses, as stated in § 22a-41 (a)(1), was discussed in detail. The commission questioned Michael W. Klein, a biologist and soil scientist, on the impact the proposal would have on the wetlands. Klein stated that the excavation of wetland 1 would not result in an "adverse impact with respect to that detention function [the only measurable function of wetland 1] at that site."[5] (ROR, Exhibit 19, p. 66.) Additionally, Klein did not anticipate "any adverse impacts to Wetlands 3, 4, or 5 during the excavation or the construction phase of this project." (ROR, Exhibit 19, pp. 66-67.) Klein concluded: "its my judgment that not only is there no significant impact from the excavation phase, but from the final development phase of the site, there is no adverse impact on the overall level of resources in the soil." (ROR, Exhibit 19, p. 70.) There was also evidence suggesting that there would be an adverse impact to the wetlands. David Andrews, an engineer for URS, testified that there were serious concerns regarding storm water discharge and Stop Shop's rock crushing operations. (ROR, Exhibit 21, pp. 8-13.)
The record also indicates that the commission considered the long-term impact of the proposed application pursuant to § 22a-41 (a)(3). The commission s questions regarding mitigation and its desire to extend the monitoring period from a three to a five year period illustrates the commission's concern with long-term effects. Commissioner Lemmon questioned Klein extensively about environmental planning as well as post-excavation monitoring and restoration. (ROR, Exhibit 19, pp. 71-74.) On the eve of its decision, Lemmon questioned Stop Shop representatives about a satisfactory monitoring plan offsetting any detrimental long term impact of the excavation project. (ROR, Exhibit 25, pp. 19-26.)
The loss of and damage to the wetlands was also discussed at length pursuant to § 22a-41 (a)(4). Most of the commission's questions were directed towards Stop Shop's proposed mitigation efforts. John Mancini, an engineer, spoke at length about Stop Shop's mitigation proposal. Mancini stated that "[Stop Shop is] looking to increase the wetlands by two tenths of an acre or so in this area. . . ." (ROR, Exhibit 19, p. 47.) Klein further explained that Stop Shop will create additional wetland area in wetland 3 and restore wetland 1 after the excavation. (ROR, Exhibit 19, p. 67.) The commission also articulated its concerns regarding mitigation and the monitoring period after the excavation. (ROR, Exhibit 21, p. 44.) Finally, the commission's decision to grant the permit, subject to several mitigation-based conditions, manifests its concern with respect to the criteria under § 22a-41 (a) CT Page 592 (4). (ROR, Exhibit 25, p. 27.)
AP also raised, in detail, concerns regarding dust and water quality. (ROR, Exhibit 23, p. 31, 36.) Dave Bjerklie, an engineer with URS Engineering, discussed water quality and cancer issues. Bjerklie stated that the excavation could surface toxic chemicals and that these concerns were not properly addressed in Stop Shop's application. (ROR, Exhibit 21, pp. 22-24.) The commission also voiced concern about the levels of dust that the project would generate. Stop Shop witnesses explained that the small size of the operation and relative short duration of the excavation would not create a significant amount of dust. (ROR, Exhibit 23, p. 70.) Additionally, Bill Horne, President of the Branford Land Trust, spoke on behalf of the Citizens for Branford's Environment. Horne raised several issues regarding the landscaping and condition of the wetlands after the excavation project. Accordingly, the record reflects that the commission considered the criteria enumerated under § 22a-41
(a)(5) and (a)(6) respectively.
 B. Whether The Commission Properly Determined That No Feasible And Prudent Alternative Existed
AP also argues that Stop Shop failed to proffer reasonable alternatives to the excavation proposal. The alternatives focused on the subsequent development of the supermarket. Moreover, AP contends that the commission improperly based its decision on these alternatives. Stop Shop counters that it adequately presented alternatives and that the commission acted properly within its authority in approving the application. The court finds that the commission considered the reasonable alternatives proffered by Stop Shop pursuant to General Statutes §22a-41 (b).
Section 22a-41 (b) imposes an additional requirement on the commission when it holds a public hearing on any particular application. Section 22a-4
1(b) provides in relevant part that when the commission makes a finding "that the proposed activity may have a significant impact on wetlands or watercourses, a permit shall not be issued unless the commissioner finds on the basis of the record that a feasible and prudent alternative does not exist." General Statutes § 22a-41 (b). The record demonstrates that the commission could have reasonably concluded that there were no reasonable alternatives. Stop Shop proffered five alternatives. (ROR, Exhibit 19, p. 62.) AP argues, however, that Stop Shop's alternatives, and the commission s subsequent conclusions, contravene § 22a-41. CT Page 593
Our Supreme Court has rejected the proposition that "the agency's decision making process . . . requires explicit consideration of each proposed alternative and an explicit finding that all other alternatives are not feasible and prudent." Samperi v. Inland Wetlands Agency, supra,226 Conn. 589-90. "Section 22a-41 (b) requires only that the commissioner make a singular finding that a feasible and prudent alternative does not exist." (Internal quotation marks omitted.) Id., 590. "The legislature, in effect, has placed the initial and principal responsibility for striking the balance between economic activities and preservation of wetlands in the hands of the local authorities. In striking that balance, the local inland wetlands agency is required only to manifest in some verifiable fashion that it has made a finding of no feasible or prudent alternative. Although the agency may manifest its findings explicitly, in those cases in which its findings are implicit in its decision, the reviewing court has the responsibility to search the record for substantial evidence in support of the agency's action." (Emphasis added.) Id., 592-93. "The applicant . . . must demonstrate to the local inland wetlands agency that its proposed development plan, insofar as it intrudes upon the wetlands, is the only alternative that is both feasible and prudent." Id., 593.[6]
The record supports Stop Shop's position that the commission properly considered feasible and prudent alternatives to the proposed excavation plan. Stop Shop presented five alternatives to the commission. The alternatives included a non-rock excavation plan and several other proposals that would incorporate different sized buildings. (ROR, Exhibit 5 and Exhibit 19, pp. 61-62.) Mancini testified that Stop Shop considered all of the alternatives in finally deciding on the proposal before the commission. (ROR, Exhibit 19, pp. 60-63.) Stop Shop determined, and the commission agreed, that the other alternatives were neither prudent nor feasible from the standpoint of rock excavation. (ROR, Exhibit 25, pp. 9-11.) The commission also considered whether any other alternative would assuage its concerns regarding mitigation and environmental impact. (ROR, Exhibit 25, p. 10.) This court finds that Stop Shop met its burden and the commission properly assessed the feasibility of alternatives to the proposal.
 C. Whether The Commission Properly Assessed The Environmental Impact Of The Proposal With Respect To Storm Water Discharge
AP also argues that the commission neglected to consider the environmental impact of the proposal with respect to storm water discharge. AP claims that the failure to do so constitutes a violation CT Page 594 of § 10.2 of the commission's regulations. Stop Shop responds that the record reveals lengthy testimony by witnesses on this issue and extensive questioning by the commission. This court finds that the commission adequately contemplated the issue of storm water discharge.
Section 10.2, entitled "Criteria for Decision," provides a list of factors that the commission must consider in rendering a decision on an application. Section 10.2(a) requires the commission to weigh "the impact of the proposed regulated activity on wetlands or watercourses." Branford Inland Wetlands and Watercourse Regs., § 10.2(a). As stated previously, the factors set forth in the regulations mirror those delineated in § 22a-41.
Review of the record demonstrates that issues regarding storm water discharge were raised by AP's expert witnesses. Both David Andrews and Bjerklie testified that the application did not adequately resolve the problem of storm water discharge. (ROR, Exhibit 21, p. 8 and Exhibit 23, p. 38.) Horne also voiced his concern regarding the possible impact of storm water overflow on the neighboring residential complexes. (ROR, Exhibit 23, p. 18.) In response, Stop Shop provided expert testimony concerning storm water discharge to support its application. Terry Gallagher, an engineer, and Mancini, testified that they performed permeability tests on the proposed detention basin and concluded that there would not be a flooding problem. (ROR, Exhibit 23, p. 52-60.)
The commission questioned Gallagher, as well as Mancini, about permeability and the accuracy of their tests. (ROR, Exhibit 23). The commission also discussed this issue in its final deliberations. Lemmon stated that Stop Shop adequately planned for storm water flow and drainage. (ROR, Exhibit 25, p. 8.) The commission also conditioned approval of the application upon Stop Shop taking certain measures, such as storm water monitoring, to prevent drainage problems. (ROR, Exhibit 25, pp. 15, 22, 26.) Therefore, the court finds that the record demonstrates that the commission considered storm water discharge pursuant to its regulations and § 22a-41.
 CONCLUSION
For all of the foregoing reasons, the court finds that there is substantial evidence that the commission evaluated the factors enumerated in § 22a-41 (a), considered reasonable alternatives and assessed storm water drainage in making its decision. Therefore, this appeal should be dismissed.
 ___________________ Prats, J.
CT Page 595